Argued and submitted December 13, 2004, affirmed June 22, 2005

MARK ALLEN PINNELL,
*Appellant,*

*v.*

Joan PALMATEER,
Superintendent,
Oregon State Penitentiary,
*Respondent.*

94C-13573; A113174

114 P3d 515

Eric M. Cumfer argued the cause and filed the briefs for appellant.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Robert B. Rocklin, Assistant Attorney General.

Before Landau, Presiding Judge, Armstrong, Judge, and Deits, Judge pro tempore.

LANDAU, P. J.

## LANDAU, P. J.

Petitioner was convicted of aggravated murder and felony murder and sentenced to death. The convictions and sentence ultimately were affirmed on direct appeal. Petitioner then filed a petition for post-conviction relief, advancing a number of claims concerning the constitutionality of the criminal trial proceedings and the adequacy of his counsel. The trial court rejected those claims and dismissed the petition. Petitioner appeals, assigning error both to the dismissal of those claims and to what he contends were erroneous rulings by the trial court in the post-conviction proceeding itself. We affirm.

## I. FACTUAL BACKGROUND

We begin with a brief summary of the underlying facts and leave to our analysis of particular assignments of error any additional facts that are relevant to those assignments. The Supreme Court summarized the facts leading to the criminal trial as follows:

"In August 1985, [petitioner] contacted Randy Brown in response to an advertisement placed by Brown in 'Swing N Sway' Magazine, a publication through which persons meet for sexual purposes. [Petitioner] and Brown met and engaged in homosexual relations. On September 9, 1985, [petitioner] again contacted Brown and arranged to meet with him later that evening at Brown's residence. [Petitioner] and his then constant companion, Donald Cornell, were driven by a friend to a location near Brown's house. The two men gained entry into the house and tied Brown's hands and feet together behind his back with electrical cord and other materials. Brown also was blindfolded and gagged. [Petitioner] and Cornell repeatedly threatened Brown with a knife, and one of the men kicked Brown on the side of the head when Brown attempted to loosen the bindings. Over the ensuing three-hour period, [petitioner] and Cornell ransacked the house, loaded the stolen property into Brown's pickup truck and left, leaving Brown tied and gagged on the bathroom floor. Brown eventually managed to summon help and suffered no permanent injuries.

"Several days later, [petitioner] obtained the use of a car from his ex-wife, Dixie Timmons. Shortly after midnight on

September 19, 1985, [petitioner] called John Ruffner, the victim in this case. Ruffner had an advertisement in the same issue of 'Swing N Sway' in which Brown's advertisement appeared. Driving Timmons' car, with Cornell and an acquaintance named Velma Varzali as passengers, [petitioner] went to the victim's apartment in Tualatin. Once there, [petitioner] parked, left Cornell and Varzali in the car, and went to see the victim. About five minutes later, Cornell left the car. Several hours later, [petitioner] and Cornell returned to the car, loaded it with property stolen from the victim's apartment, and drove back to their lodgings.

"Ruffner's body was found the next day. His apartment had been ransacked. Ruffner's body lay on the bathroom floor, with hands and feet tied behind his back in part with electrical cords ripped from appliances in the apartment. He was gagged in part with a scarf, and a ligature was wrapped around his neck. Additionally, a large wad of tissue paper was stuffed into his mouth. The autopsy revealed that Ruffner died of asphyxiation as a result of either the tissue or the ligature. Ruffner's body also had cuts on his hands and a 'blunt-force injury to the right side of his head.'

"On September 22, 1985, [petitioner] and Cornell were arrested. [Petitioner] eventually was indicted for six counts of aggravated murder and two counts of felony murder involving a single victim, Ruffner. [Petitioner] was found guilty by the jury of all eight counts. At sentencing, all counts were merged into count number 1, aggravated murder by torture."

*State v. Pinnell*, 311 Or 98, 100-02, 806 P2d 110 (1991).

Following petitioner's conviction, the trial court held a penalty-phase proceeding, after which it sentenced petitioner to death. The Supreme Court affirmed petitioner's conviction but vacated the sentence of death based on the trial court's failure to instruct the jury on what has come to be known as the "fourth question" required by *State v. Wagner*, 309 Or 5, 14-20, 786 P2d 93, *cert den*, 498 US 879 (1990), an instruction that permits the jury to spare a defendant's life if it believes that, under all the circumstances, it is appropriate to do so. *Pinnell*, 311 Or at 117-18. On remand, petitioner was again sentenced to death. On direct and automatic review,

the Supreme Court affirmed that death sentence. *State v. Pinnell*, 319 Or 438, 446, 877 P2d 635 (1994).

Petitioner filed a petition for post-conviction relief in Marion County Circuit Court. The petition alleged four claims for relief: (1) In the first of the criminal proceedings, petitioner received constitutionally inadequate assistance of counsel in 38 specific ways at trial and on appeal; (2) in the operative penalty proceeding, petitioner received constitutionally inadequate assistance of counsel in 56 ways at trial and on appeal; (3) petitioner was denied constitutionally adequate assistance of counsel and denied a myriad of constitutional rights when counsel failed to argue various issues concerning the constitutionality of the death penalty; and (4) the trial court in the second penalty proceeding committed a variety of reversible errors.

The case was assigned to Judge Rhoades. Following trial, Judge Rhoades issued a decision by way of a carefully crafted, 24-page set of findings of fact and conclusions of law explaining the grounds for the court's decision to dismiss all of petitioner's claims for post-conviction relief. We will refer to portions of those findings and conclusions as they are pertinent to the disposition of the issues on appeal.

## II. DISPOSITION OF THE MERITS

On appeal, petitioner advances 17 assignments of error, some pertaining to the conduct of the post-conviction trial itself, one pertaining to the constitutionality of Oregon's death penalty statute, one pertaining to the dismissal of a claim concerning trial court error in the second penalty-phase proceeding, and others pertaining to the post-conviction trial court's disposition of his post-conviction claims. We begin with the assignments that pertain to the conduct of the post-conviction trial and then address the balance of his assignments.

### A. *Conduct of the post-conviction trial*

Petitioner contends that the post-conviction trial court committed two reversible errors in the conduct of the post-conviction trial itself. First, petitioner contends that the post-conviction judge erred in declining to recuse herself and

in denying a motion for a new trial based on what petitioner characterizes as *"ex parte* contacts" with another judge on the same court. Second, petitioner contends that the post-conviction trial court erred in excluding certain documentary evidence that petitioner sought to introduce to impeach one of his penalty-phase attorneys. We address each assignment in turn.

### 1. *Motion to recuse and motion for a new trial*

As we have noted, one of petitioner's post-conviction claims related to the performance of counsel during the second penalty-phase proceeding. At trial on that claim, petitioner called Lundberg-Rogers, who had testified as a "mitigation specialist" for petitioner in the second penalty-phase proceeding. Her role in that proceeding apparently was to interview petitioner and other persons and assist the defense team in making a case for mitigation of a possible sentence of death. In the post-conviction trial, petitioner asked Lundberg-Rogers to testify about her own performance during that proceeding, as well as the performance of other members of the defense team.

Lundberg-Rogers testified that she had been unable to view transcripts of the underlying criminal trial, that she had not been told that certain state's witnesses would testify, and that she had had "very, very little time" to prepare for the penalty-phase proceeding. Lundberg-Rogers also testified that she was "somewhat distracted" and had lost confidence and was "shaken" after learning that another case she had been working on in a similar capacity had resulted in a death sentence. Regarding her performance at petitioner's penalty-phase proceeding, Lundberg-Rogers concluded that "I tried to do the best I could, but I have to say, it was sadly lacking. * * * It was not adequate."

After the trial, the post-conviction trial court took the matter under advisement. Approximately six weeks later, Judge Leggert, also of the Marion County Circuit Court, sent a letter to the State Court Administrator's office expressing concerns about the use of mitigation specialists in death penalty cases. Judge Leggert explained that she became concerned about the issue when she examined an affidavit of Lundberg-Rogers in a case unrelated to this

appeal. Judge Leggert explained that she also had heard from Judge Rhoades that the same person had testified in this post-conviction trial and that Lundberg-Rogers had said that she had not done a good job in petitioner's case. Judge Leggert then stated:

"This raises two issues for me. First, I question whether this is even a specialty. From what Judge Rhoades told me, she understood from the testimony at her trial [that] a 'mitigation specialist' is an investigator who tries to get close to the defendant so that he will disclose information to the specialist so the specialist can locate witnesses who might mitigate the sentence. This whole concept to me seems absurd at best and not required by the constitution in providing a defense to a criminal defendant. I believe this represents a waste of taxpayer money and is one area [that] the indigent defense fund could work to cut costs. This is especially concerning as Judge Rhoades has been informed that these people are paid extra for their work and spend countless hours meeting with the defendant in an effort to * * * gain the trust of the defendant.

"The second issue for me is the quality of this particular person's work. I am very concerned about the statements in her affidavit concerning the work that she did in this case, and Judge Rhoades had additional concerns regarding the testimony she gave in a case of hers. In this vein, the question I have is what kind of oversight or qualification requirements do we have for this position."

Petitioner obtained a copy of the letter about a week later. He later filed a motion for a new trial and a motion to recuse Judge Rhoades and any other member of the Marion County Circuit Court. Petitioner alleged that Judge Leggert's letter demonstrated that Judge Rhoades had "obtain[ed] information on a matter which was tried before her and outside the record."

Judge Rhoades denied the motion, explaining that the motion was untimely and lacked merit. Judge Rhoades explained that her conversation with Judge Leggert was part of "the court's ongoing obligation of judicial administration."

On appeal, petitioner renews his argument that Judge Leggert's letter demonstrates that, in deciding his

case, Judge Rhoades did not limit herself to the record developed at trial. Citing *Lamonts Apparel, Inc. v. SI-Lloyd Associates*, 153 Or App 227, 956 P2d 1024 (1998), he argues that, because of Judge Rhoades's *ex parte* contacts, the trial judge had an obligation to recuse herself and order a new trial.

The state argues that Judge Leggert's letter does not demonstrate anything with respect to information that Judge Rhoades considered in this case. According to the state, the letter speaks only of information that Judge Rhoades provided to Judge Leggert, not the other way around. In any event, the state argues, the sort of judge-to-judge communication that the letter reflects is not impermissible. The state argues that, even if it were, petitioner has failed to demonstrate any sort of prejudice that could reasonably be associated with the exchange that the letter recounts.

■ We review the trial court's denial of a motion to recuse for an abuse of discretion. *Lamonts Apparel, Inc.*, 153 Or App at 231. In this case, we find none.

■ We note at the outset that we are not confronted with an *ex parte* contact. An *ex parte* contact ordinarily refers to contacts "[d]one or made at the instance and for the benefit of one party only[.]" *Black's Law Dictionary* 616 (8th ed 2004). In this case, the only relevant contact is a conversation that apparently took place between two judges.

Conversations between judges about matters in the record are expressly permitted by the Oregon Code of Judicial Conduct. Thus, although JR 2-102(B) requires judges to refrain from communicating with "a lawyer or party about any matter in an adversary proceeding outside the course of the proceeding," JR 2-102(E) expressly provides that the code "does not limit * * * any discussions about * * * matters in the record related to a case that occur between a judge and * * * another judge of the same level; employees of the court; [or] employees of the judicial branch of government."

To be sure, that does not mean that judges have *carte blanche* to acquire information outside of the record about matters in dispute. In *Lamonts Apparel, Inc.*, for example, the dispositive issue was whether a motion for judgment

notwithstanding the verdict had been timely filed. The original of the motion in the trial court file included a certificate of service showing that it had been timely filed, but the clerk's stamp on the face of the motion showed that the clerk's office had received it a day late. One party asserted that the clerk's stamp was incorrect, while the other asserted that it was correct. After an evidentiary hearing on the matter, the trial court took the matter under advisement. The judge then paid a personal visit to the clerk's office to discuss, among other things, whether the file stamp was irregular and whether the clocks were properly synchronized. When one of the parties learned of the conversation, a motion to recuse quickly followed. The trial court denied the motion, but we reversed. We concluded that, because the judge's acquisition of information regarding factual issues reasonably raised a question about his impartiality, the judge erred in not recusing himself. *Lamonts Apparel, Inc.*, 153 Or App at 229-31; 234-35.

In contrast, in this case, there is no evidence that Judge Rhoades acquired any information, much less that she acquired the information by conducting an independent investigation of material witnesses. Judge Leggert's letter recounts only what she had learned *from* Judge Rhoades.

Even assuming that Judge Rhoades acquired information from her conversations with Judge Leggert, there is no evidence that petitioner suffered any prejudice as a result. On the contrary, the only information that Judge Leggert relates in her letter is precisely the sort of information that petitioner himself was attempting to elicit from Lundberg-Rogers, namely, that she and the defense team had performed poorly during the penalty-phase proceeding.

Petitioner appears to acknowledge that point, but, citing *Trice v. Baldwin*, 140 Or App 300, 915 P2d 456 (1996), urges us nevertheless to presume prejudice. In *Trice*, however, the judge in the petitioner's underlying criminal trial had conferred with a detective who had just testified at trial about the very issues that were the subject of the detective's testimony. We held that such contact with a witness "is presumptively prejudicial." *Id.* at 306. In this case, however,

there was no improper contact with a witness. *Trice* is distinguishable and its presumption of prejudice inapplicable to this case.

We conclude that the post-conviction trial court did not abuse its discretion in denying defendant's motion to recuse. As for the motion for a new trial, petitioner acknowledges that his contention that the court erred in denying that motion "hinges on the motion to recuse." Given our disposition of petitioner's arguments concerning the motion to recuse, it is clear that the court did not err in denying the motion for a new trial.

### 2. *Impeachment evidence*

One of petitioner's post-conviction claims involves the adequacy of his representation by Bassel, one of his attorneys at the second penalty-phase proceeding. To respond to that claim, the state sent a letter to Bassel in which it asked him a series of questions about his representation of petitioner. Bassel responded by letter. The state then obtained an affidavit from Bassel concerning his work for petitioner. The affidavit was admitted into evidence in the post-conviction trial. It contained, among other things, three statements that are pertinent to the issues on appeal.

First, Bassel's affidavit stated that, "[p]rior to the time the second penalty phase commenced, [petitioner] was one of the most difficult clients I have ever had to work with. After the hearing actually began, [petitioner] was one of the best clients I have ever worked with."

Second, the affidavit stated that "I recall that I went through a 'dry rehearsal' of [psychologist] Dr. Colby's testimony in person on two occasions prior to the penalty-phase hearing."

Third, the affidavit stated that, "[n]otwithstanding any time limitation we may have had, I believe the mitigation team we assembled was able to gather sufficient information to present to the jury a picture of [petitioner's] upbringing and the obstacles he had faced that might explain to the jury his actions the night of [the victim's] murder." It also states that "I do not recall any particular matter that was left uninvestigated because of time constraints."

Petitioner offered into evidence the state's letter to Bassel as Exhibit 6 and Bassel's reply as Exhibit 16. The state objected on relevancy and hearsay grounds. Petitioner responded that he was offering the exhibits as prior inconsistent statements with which he wished to impeach Bassel's affidavit. According to petitioner, Bassel's affidavit "is in some measure" different from his answers to the state's letter, although he did not explain in what particular respects that was so. The post-conviction trial court sustained the state's objection.

On appeal, petitioner renews his contention that the two exhibits were relevant and admissible prior inconsistent statements. In response, the state argues that, among other things, the exhibits were irrelevant, given that they demonstrate no inconsistencies.

We agree with the state. Petitioner contends that the excluded exhibits demonstrate inconsistencies in Bassel's testimony in three particulars. But, on examination of the pertinent portions of the exhibits and Bassel's affidavit, we are not persuaded that any inconsistencies exist.

■ OEC 613 permits a party to attack the credibility of a witness with a prior inconsistent statement as long as the declarant is given the opportunity to explain or deny the supposed inconsistency. OEC 806, however, provides an exception to that rule:

> "When a hearsay statement * * * has been admitted in evidence, the credibility of the declarant may be attacked * * * by any evidence which would be admissible for those purposes if the declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the hearsay statement of the declarant is not subject to any requirement under [OEC 613] relating to impeachment by. evidence of inconsistent statements."

In either event, however, the attack on the declarant's credibility must be by means of an *inconsistent* statement. The rules of evidence themselves do not define the term "inconsistent," but, in *Rigelman v. Gilligan*, 265 Or 109, 121, 506 P2d 710 (1973), the Supreme Court explained that statements

are "inconsistent" if there is a "material variance" between them.

Petitioner first contends that, while Bassel's affidavit states that petitioner was a difficult client, the excluded exhibits contradict that statement. Petitioner points out that, in Exhibit 6, the state asked Bassel whether petitioner's "reluctance to discuss his history or involve his family in his case hinder[ed his] ability to prepare a defense for the penalty phase," and, in Exhibit 16, Bassel responded that he did not recall that petitioner's reluctance hindered the investigation. Petitioner states that Bassel's affidavit is inconsistent with his response in Exhibit 16, because there is no mention of petitioner being difficult in Exhibit 16. That Bassel's letter did not mention whether petitioner was difficult comes as no surprise. He was not asked that question. Thus, there is no material variance.

Petitioner next contends that Exhibit 16 contradicts Bassel's statement in his affidavit that he went through a "dry rehearsal" with Dr. Colby regarding his testimony. What Exhibit 16 says, however, is that Bassel did not "recall what, if anything was discussed about the [Minnesota Multiphasic Personality Index]," a particular psychological test. Bassel also said that "I do recall rather extensive conversations with Dr. Colby to prepare his testimony, however." Again, we find nothing inconsistent among the various statements.

Third, petitioner complains that the excluded exhibits contradict the portion of Bassel's affidavit that states that the defense team gathered "sufficient information" and that he did not recall "any particular matter that was left uninvestigated." What the excluded exhibits reveal, however, is that, although "[t]his was [Bassel's] first murder case and [he] had a lot of work to do in a very short period of time," he did not recall having any concerns about not being present when the judge addressed the jury pool before *voir dire*. Again, there is no inconsistency that would justify admission of the excluded exhibits for the purpose of impeachment. We therefore conclude that the post-conviction trial court did not err in excluding them.

## B. *Constitutionality of Oregon's death penalty statute*

Petitioner next contends that the case should be remanded for resentencing because Oregon's death penalty statute, ORS 163.150,[1] is unconstitutional for a number of reasons. First, petitioner contends that the future dangerousness and deliberateness determinations that the jury must make in order to impose a sentence of death under ORS 163.150 violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. According to petitioner, the United States Supreme Court's decision in *Ring v. Arizona*, 536 US 584, 122 S Ct 2428, 153 L Ed 2d 556 (2002), holds that the future dangerousness and deliberateness findings are the functional equivalent of elements that must be pleaded in the indictment and proved to the jury beyond a reasonable doubt. Petitioner argues that the future dangerousness provision does not meet the Eighth Amendment's "heightened reliability requirement" as interpreted in *Ring* because it permits the jury to find that a defendant is likely to be dangerous in the future by a standard that is lower than the necessary "beyond a reasonable doubt" standard. Second, petitioner also contends that the death penalty statute is unconstitutional because it permits the use of evidence that would be inadmissible to prove an element of the underlying conviction to establish the "elements" necessary to impose the death penalty. Finally, according to petitioner, the death penalty statute is unconstitutional because the future dangerousness finding "permits criminal punishment of future misconduct."

The state responds that, because petitioner failed to raise in any of his direct appeals the constitutional issues

---

[1] ORS 163.150(1) provides, in part, that:

"(b) Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"* * * * *

"(d) The state must prove each issue submitted under paragraph (b)(A) to (C) of this subsection beyond a reasonable doubt[.]"

that he now asserts, he is precluded under *Palmer v. State of Oregon*, 318 Or 352, 361-62, 867 P2d 1368 (1994), from raising them for the first time in a petition for post-conviction relief. Moreover, the state argues, petitioner failed even to include the constitutional arguments in his initial petition for relief to the circuit court. Under ORS 138.550(3) and *Bowen v. Johnson*, 166 Or App 89, 92-93, 999 P2d 1159, *rev den*, 330 Or 553 (2000), the state contends, he is now precluded from raising them on appeal. Finally, the state contends that, even if otherwise reviewable, the argument petitioner now asserts has already been rejected by our Supreme Court in *State v. Oatney*, 335 Or 276, 66 P3d 475 (2003), *cert den*, 540 US 1151 (2004), and that, furthermore, the Oregon Supreme Court's decision in *Page v. Palmateer*, 336 Or 379, 390, 84 P3d 133, *cert den*, ____ US ____, 125 S Ct 205 (2004), makes clear that the holding of *Ring* "does not apply retroactively to Oregon post-conviction proceedings."

We conclude that each of the state's points is well taken and reject petitioner's arguments without further discussion.

C. *Trial court error in the second penalty-phase proceeding*

Petitioner next complains that the post-conviction trial court erred in dismissing his claim for post-conviction relief arising out of errors that the trial court committed during the second penalty-phase proceeding. Specifically, petitioner assigns error to the dismissal of the portion of his claim pertaining to what he regards as "coercion" by court personnel in that proceeding. According to petitioner, an affidavit from the jury foreperson in the second penalty-phase proceeding demonstrates that the jurors were improperly informed by the court's judicial assistant that the court "would keep us there until we reached a verdict [and] that this could be very late into the night."

The state argues that the post-conviction trial court did not err in dismissing petitioner's claim. In the alternative, it argues by way of a cross-assignment of error that the court should not have admitted the jury foreperson's affidavit — petitioner's only evidence of the claimed misconduct — in the first place.

██ We review the admission of a juror's affidavit regarding jury deliberations for abuse of discretion. *Koennecke v. State of Oregon*, 122 Or App 100, 103, 857 P2d 148, *rev den*, 318 Or 26 (1993). It is the long-standing rule in Oregon that the "[a]ffidavit[s] of jurors will not be received to impeach their verdict." *Cline v. Broy*, 1 Or 89, 90 (1854). While that flat prohibition has been relaxed somewhat since the nineteenth century, it is still " 'a strong policy in Oregon to protect jury verdicts from attack, and courts are hesitant to interrogate jurors after they have reached a verdict in order to probe for potential misconduct.' " *State v. Cheney*, 171 Or App 401, 415, 16 P3d 1164 (2000), *rev den*, 332 Or 316 (2001) (quoting *Koennecke*, 122 Or App at 103); *see also Leland Properties v. Burton Engineering and Survey*, 152 Or App 557, 563, 954 P2d 851, *rev den*, 327 Or 620 (1998) ("Few principles are more time honored in our jury system than the rule that affidavits of jurors will not be considered as evidence to impeach the jury's verdict."). Only in cases in which the misconduct at issue "amounts to fraud, bribery, forcible coercion or any other obstruction of justice that would subject the offender to a criminal prosecution" will the court consider "an attack upon a verdict by a juror's affidavit[.]" *Carson v. Brauer*, 234 Or 333, 345, 382 P2d 79 (1963).

██ In this case, the alleged misconduct is a statement by a member of the court staff to the jury during its deliberations in the second penalty-phase proceeding. The jury foreperson's affidavit states that, sometime during deliberations, the jury was advised by the court's secretary that the court "would keep us there until we reached a verdict [and] that this could be very late into the night." That does not amount to the sort of misconduct described in *Carson* that would warrant considering "an attack upon [the] verdict by a juror's affidavit." The post-conviction trial court did not abuse its discretion in denying petitioner post-conviction relief on the ground that the jury verdict had been improperly coerced.

D. *Inadequate assistance of counsel claims*

As we have noted, the post-conviction trial court dismissed each of petitioner's inadequate assistance of counsel claims. On appeal, petitioner assigns error to the court's decision with respect to several of those claims.

To prevail on an inadequate assistance of counsel claim under the Oregon Constitution, petitioner must prove, by a preponderance of the evidence, that counsel failed to exercise the professional skill and judgment necessary to "diligently and conscientiously advance the defense" and that he was prejudiced as a result of that failure. ORS 138.620(2); *Stevens v. State of Oregon*, 322 Or 101, 108, 902 P2d 1137 (1995). Petitioner can prove that he suffered prejudice under the Oregon Constitution only if counsel's failure had "a tendency to affect the result of the prosecution." *Krummacher v. Gierloff*, 290 Or 867, 883, 627 P2d 458 (1981).

Under the federal constitution, a petitioner must demonstrate that counsel's performance "fell below an objective standard of reasonableness * * * under prevailing professional norms" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 US 668, 688, 694, 104 S Ct 2052, 80 L Ed 2d 674 (1984). A reasonable probability is one that "undermine[s] confidence in the outcome." *Id.* at 694. In certain limited cases under the Sixth and Fourteenth Amendments, prejudice is presumed, such as when there is an actual or constructive complete denial of representation or when there is state interference with a defendant's representation. *Id.* at 692.

■■ We are bound by the factual findings of the post-conviction trial court if there is evidence in the record to support them. *Cunningham v. Thompson*, 186 Or App 221, 226, 62 P3d 823, *adh'd to as modified on recons*, 188 Or App 289, 306, 71 P3d 110 (2003), *rev den*, 337 Or 327 (2004). When the post-conviction trial court does not make factual findings, we assume that it decided the facts consistently with its ultimate decision on the issue. *Id.* We review the post-conviction trial court's legal conclusions for errors of law. ORS 138.650; ORS 138.220; *Cunningham*, 186 Or App at 226.

■ With the foregoing principles in mind, we turn to petitioner's particular assignments of error.

## 1. *Trial counsel's failure to call LaPine as a witness at trial*

Petitioner argues that his guilt-phase trial counsel's decision not to call LaPine as a witness at trial constitutes inadequate assistance of counsel. According to petitioner, LaPine's testimony would have directly contradicted the testimony of Varzali—a state's witness whose testimony placed petitioner at the crime scene at the time of the murder—regarding the order in which petitioner and his accomplice, Cornell, entered the victim's apartment. According to petitioner, "[i]f Varzali could be shown to be wrong about even the most basic details of the crime, her credibility in the remainder of her testimony would likely have been destroyed." The state counters that LaPine's testimony did not contradict Varzali's and that petitioner's trial counsel reasonably declined to call LaPine because her testimony would have only reinforced the conclusion that petitioner had gone to the victim's apartment at the time of the murder—a fact to which Varzali was unable to testify.

We do not understand how LaPine's testimony would have impeached that of Varzali as petitioner contends. The victim was found dead in his apartment on Friday, September 20, 1985. At trial, Varzali testified that, on the night of Wednesday, September 18, 1985, she had driven with petitioner and Cornell to a grocery store pay phone where they had met "someone" whom she could not identify but who drove a truck "like a Toyota." Varzali testified that she, petitioner, and Cornell then followed the truck to the apartment complex in which the victim was later found dead, that petitioner parked and left the car, and that approximately five minutes later, Cornell followed. Varzali could not state where the two had gone. Varzali testified that she slept in the car until Cornell returned and drove to the front of "an apartment" from which petitioner and Cornell began removing various items.

LaPine was a neighbor of the victim. She testified in a pretrial hearing that she had seen the victim near midnight one night "during the first part of the week" of September 20, 1985. She stated that she saw the victim with Cornell as she

was walking to her apartment, which was near the victim's apartment.

As the state points out, nothing in LaPine's pretrial testimony contradicts the testimony of Varzali. The two versions of events are not incongruent, particularly given that Varzali could not testify to anything that occurred after petitioner and Cornell left the car. Furthermore, given that Varzali was unable to identify the person with whom petitioner and Cornell met after leaving the car on the night of September 18, LaPine's testimony appears to do petitioner more harm than good; it makes it more likely that the person whom they met was indeed the victim.

Given that LaPine's testimony could do little, if anything, to impeach Varzali's testimony, but could connect petitioner and Cornell to the victim near the time of the murder, it was a reasonable tactical decision not to call LaPine as a witness at trial. Thus, we cannot say that, in declining to call LaPine as a witness, petitioner's trial counsel failed to "diligently and conscientiously advance the defense." The post-conviction trial court did not err in denying petitioner post-conviction relief on that ground. *See Cunningham*, 186 Or App at 226 (reviewing court will not second-guess counsel's tactical decisions unless those decisions "reflect an absence or suspension of professional skill and judgment").

### 2. *Trial counsel's cross-examination of witness Lewman*

Petitioner contends that his guilt-phase trial counsel's performance was constitutionally inadequate because, on cross-examination of Dr. Larry Lewman, the state medical examiner, trial counsel "attacked" Lewman's opinion that the victim had likely died in a matter of minutes. According to petitioner, because of that cross-examination, trial counsel undermined petitioner's theory of the case, which was that the homicide was unintentional and thus felony murder rather than aggravated murder. The state argues that trial counsel's line of questioning was reasonably calculated to lead the jury to the conclusion that the victim's death was accidental and that, in any event, petitioner has failed to demonstrate that trial counsel's conduct prejudiced him.

At trial, the state called Lewman to testify as to his opinion regarding the cause and manner of the victim's death. Lewman testified on direct examination that, as the result of a ligature around his neck and a "three-inch wad of mucus and blood soaked tissue paper * * * crammed in his mouth" the victim's airway was "completely occluded" and he died because his "air supply * * * was cut off." When asked about how long the victim might have lived under such conditions, Lewman offered that he didn't "think very long" and that "generally speaking, if somebody's airway is completely occluded * * * it takes about three minutes to put them in a position where they can't recover."

At that point in Lewman's testimony, petitioner's trial counsel objected and asked, "[Y]ou don't know at what point the tissue occluded the airway, do you sir?" Lewman answered, "That's correct * * * [but] I can say sooner rather than later." Petitioner's trial counsel then asked, "[Y]ou can't say [whether the tissue] occluded it right away or [whether it] may have been hours,* * * [y]ou can't tell the jury at what point in time the airway was occluded." On redirect, Lewman testified that he thought that the victim had likely died "sooner rather than later. I don't think he lay there for several hours[,] * * * it was probably a few minutes[.]"

Petitioner contends that his trial counsel's cross-examination undermined his theory of the case. According to petitioner, establishing a short time of death was "critical [to his defense] in two respects." First, it would have negated the element of torture that was the basis for one of petitioner's aggravated murder charges, and second, establishing a short time of death also would have

"increased the likelihood that [the victim's] death was accidental rather than intentional, because it shortened the time that the defendants, who were busy ransacking the apartment, could have seen that [the victim] was in serious, life-threatening distress, rather than just suffering the significant discomfort one would expect from being hogtied."

Thus, according to petitioner, his trial counsel's cross-examination actually increased the likelihood that the jury would find him guilty of the aggravated murder charges.

The state counters that establishing that a long period of time had elapsed between the time when the victim was bound and gagged and when he died would have made it more likely that the victim's death was accidental. The state points out that, as the post-conviction court noted, "[i]f the victim's airway became occluded at some point after petitioner left the victim's apartment, * * * then [petitioner's trial counsel's] argument that petitioner had not intended to cause the victim's death gains credibility." Thus, according to the state, it was reasonable for petitioner's trial counsel to question Lewman's conclusion that the victim had died quickly and to attempt to establish that the victim instead died at some later point in time.

We agree with the state that petitioner's trial counsel's cross-examination of Lewman did not fall below the constitutional standard. Attempting to insert doubt into the precise timing of the victim's death was a reasonable strategy because, as the post-conviction trial court reasoned, establishing that the victim's airway became occluded at some time after petitioner left the apartment would have lent credibility to the argument that petitioner had not intended to cause the victim's death. In short, pursuing that strategy was a reasonable decision by petitioner's trial counsel that did not "reflect an absence or suspension of professional skill or judgment." The post-conviction trial court did not err in denying petitioner post-conviction relief on that ground.

3. *Trial counsel's failure to locate and present percipient witnesses*

Petitioner also contends that his guilt-phase trial counsel's performance was constitutionally inadequate because counsel failed to locate certain witnesses—a paper boy and two police officers—who petitioner contends saw him at the victim's apartment complex and would have been able to testify that petitioner was not in the victim's apartment at the time that the victim was bound and gagged. The state counters that, even if trial counsel failed to investigate adequately those witnesses, petitioner has failed to show what their testimony would have been and, thus, has failed to demonstrate that he was prejudiced by that failure. We agree with the state.

■ As the post-conviction trial court found, "[p]etitioner did not present evidence in this proceeding to demonstrate what [the] witnesses would have said had they been found by petitioner's counsel." Such an absence of evidence regarding the content of potential witness testimony is insufficient to demonstrate prejudice. *New v. Armenakis*, 156 Or App 24, 28-29, 964 P2d 1101 (1998), *rev den*, 328 Or 594 (1999). The trial court did not err in denying petitioner post-conviction relief on that ground.

### 4. *Trial counsel's supervision of investigator Eldred*

■ Petitioner next contends that his guilt-phase trial counsel's performance was inadequate because he failed to supervise adequately the defense investigator, Eldred. According to petitioner, Eldred disclosed privileged information to Varzali, causing her to substantially alter her testimony in a manner that prejudiced petitioner. The state responds with a number of arguments, the dispositive point being that, even if petitioner's guilt-phase trial counsel acted unreasonably in his supervision of Eldred, petitioner failed to prove that he was prejudiced as a result.

According to petitioner, Varzali was an alibi witness for him. Regarding the events of the night of the murder, Varzali initially testified at a pretrial hearing that she had stayed at petitioner's apartment, where petitioner and Cornell had spent the evening "doing laundry." According to Varzali, she slept at the apartment that night and, when she awoke, she saw a number of items of property that had not been there previously. Varzali originally stated that petitioner had claimed that he had gotten the items from his ex-wife.

Eldred conducted a follow-up interview of Varzali. According to petitioner, during that interview, Eldred told Varzali that petitioner had admitted his involvement in the murder and that petitioner had claimed that Varzali drove him and Cornell to the victim's apartment. According to petitioner, as a result of Eldred's disclosures, Varzali changed her testimony and admitted to police that she had been in the car with petitioner and Cornell on the night of the murder and that she had accompanied them to the apartment complex where the victim had lived. That, contends petitioner,

amounted to inadequate assistance of counsel because trial counsel should have supervised Eldred more closely, thereby preventing such a disclosure of privileged information, and because the failure to do so prejudiced petitioner by causing a potential alibi witness to change her testimony.

Even assuming that Eldred disclosed client confidences to Varzali, however, petitioner has failed to demonstrate that he was prejudiced as a result of those disclosures. As the post-conviction trial court found, "[d]uring the investigation of petitioner's alibi witness, [Varzali,] counsel and his investigators learned that, in fact, petitioner had been with this witness. However, this witness placed petitioner and herself at the scene of the crime." Varzali testified that, had she not had the conversation with Eldred, she would not have testified as she ultimately did. Varzali, however, also testified that her conversation with Eldred "was just like the little thing that knocked me over the edge to go out and tell the complete truth about what happened[.]"

We read that statement to mean that any alibi Varzali may have provided petitioner would have been based on perjured testimony and that her ultimate testimony at trial was, in Varzali's words, "the complete truth about what happened." Petitioner is not entitled to perjured alibi testimony and, thus, even if trial counsel's supervision of Eldred was inadequate, petitioner has failed to prove that he was prejudiced by Eldred's conversation with Varzali. *See Howe v. Cupp*, 55 Or App 247, 252, 637 P2d 933 (1981), *rev den*, 292 Or 863 (1982) (failure to contact witness not prejudicial because witness had only perjured alibi testimony to offer); *see also Nix v. Whiteside*, 475 US 157, 171-75, 106 S Ct 988, 89 L Ed 2d 123 (1986) ("Whatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying falsely."). The post-conviction trial court did not err in denying petitioner relief on that ground.

5. *Trial counsel's opening statement*

Petitioner next contends that his trial counsel's performance was constitutionally inadequate because, "for all practical purposes, [trial counsel] pled [petitioner] guilty to felony murder during his opening statement[.]" According to petitioner, trial counsel failed to obtain his consent to make

that "concession of guilt on the felony murder charge" and, in making that concession, failed to subject the state's theory of the case to "meaningful adversarial testing." Therefore, according to petitioner, prejudice must be presumed under the Sixth Amendment.

The state counters that the post-conviction trial court found as fact that "[petitioner's trial counsel] did not concede in his opening statement that petitioner was guilty of felony murder." Because that finding is supported by evidence in the record, the state argues, we are bound by it. In the alternative, the state contends that, if we conclude that trial counsel's statements amount to a concession of guilt, in light of the evidence that the state intended to present, conceding petitioner's guilt to felony murder was a reasonable tactical decision for which defense counsel was not required to obtain petitioner's consent. In any event, the state concludes that, in light of the strength of the state's evidence, petitioner cannot prove prejudice by any concession by trial counsel.

In his opening statement at trial, petitioner's trial counsel stated:

> "The evidence in this case will not show [that] this is an aggravated murder. It will not show that the death of [the victim] was caused by an intentional killing. The evidence will not show that there was an intent to kill [the victim]; rather, what the evidence will show is [that] the intent was the same as [petitioner's intent in carrying out an earlier burglary]: tie him up, keep him there so he doesn't move. They took his property. Why? Same purpose: sell it, use the credit cards, use the checks, get money for drugs, other things—but for money."

Even were we to read that opening statement as a concession of guilt regarding petitioner's commission of a felony murder, we could not say, in light of the state's overwhelming evidence of petitioner's involvement in the burglary of victim's apartment, that such a concession was an unreasonable trial tactic.

At trial, Varzali testified that she had accompanied petitioner and Cornell to the victim's apartment complex on the night of the murder and that petitioner had entered the

complex. Petitioner's fingerprint was found inside the victim's apartment. The circumstances of the victim's death and the manner in which the victim had been bound and gagged were nearly identical to the circumstances and method of an earlier burglary in which petitioner had been involved. Finally, the state presented evidence that petitioner and Cornell were in possession of property of the victim and that the victim had died of asphyxiation due to the manner in which he had been bound and gagged.

In light of that evidence, it was a reasonable tactic to, in effect, concede guilt as to the predicate burglary charge—and thus to the felony murder charge—but to contest the aggravated murder charges. The facts that the state intended to present could reasonably be argued as virtually certain proof that petitioner intended to restrain the victim in the course of a burglary. A concession of petitioner's involvement in a felony murder reasonably could have been made in order to preserve his credibility with the jury and avoid convictions for aggravated murder, thus avoiding the death penalty. Such a decision strikes us as a reasonable exercise of professional skill and judgment. *Cf. Burdge v. Palmateer*, 338 Or 490, 497, 112 P3d 320 (2005) (reasonable skill and judgment is exercised when counsel apprehends issue, sees a course of action that could benefit client, and concludes that the benefits of that course of action outweigh the risks). Furthermore, such a concession by counsel does not amount to a guilty plea and, thus, does not require petitioner's consent. *Florida v. Nixon*, 543 US 175, 125 S Ct 551, 560-61, 160 L Ed 2d 565 (2004) (provided that a defendant is informed of counsel's decision, reasonable strategy of conceding guilt to murder in order to preserve the defendant's credibility did not require the defendant's express consent because it is not the functional equivalent of a guilty plea). Petitioner does not contend that he was not informed of his trial counsel's strategy to focus on a defense theory that the victim's death was the unintended consequence of a burglary.

We therefore conclude that trial counsel's opening statement, even if it is understood as an admission of petitioner's guilt of felony murder, did not fall below the constitutional minimum. *See Gorham v. Thompson*, 332 Or 560,

567, 34 P3d 161 (2001) (reviewing court "will not second-guess a lawyer's tactical decisions in the name of the constitution unless those decisions reflect an absence or suspension of professional skill and judgment"). Because it was a reasonable strategy, we need not decide whether prejudice may be presumed under the Sixth and Fourteenth Amendments. The post-conviction trial court did not err in denying petitioner relief on that ground.

### 6. *Trial counsel's performance during* voir dire *and jury selection*

█ Petitioner next contends that his guilt-phase trial counsel was inadequate for failing to "conduct *voir dire* which would adequately ascertain the jurors' willingness to presume [petitioner]'s innocence until proven guilty beyond a reasonable doubt" and for "failing to adequately question obviously biased jurors and exercise necessary cause challenges during jury selection." The state responds that petitioner failed to preserve both issues. The state argues that, although petitioner's petition vaguely alleged that criminal trial counsel failed to adequately question and pursue various prospective jurors for the purposes of establishing bases for challenge, it did not identify any particular jurors whom counsel should have questioned further or what each of them said that would justify additional questioning. In any event, the state argues, petitioner failed to establish any basis for concluding that counsel's questioning during *voir dire* and jury selection was unreasonable. In particular, the state relies on the findings of the post-conviction trial court to the effect that criminal trial counsel "had available to him [the results of] an extensive jury questionnaire * * * which apparently answered many of the questions traditionally asked verbally in *voir dire*" and the court's conclusion that it would not—and that we, likewise, should not—"supplant the judgment of trial counsel in not asking more probing questions in the absence of evidence that the questionnaire was insufficent."

We agree with the state in each respect and reject petitioner's arguments without further discussion.

### 7. *Trial counsel's closing argument*

Petitioner contends that his guilt-phase trial counsel provided inadequate assistance by "pursuing totally inconsistent defenses in his closing argument, thereby failing to properly argue the case to the jury." The state counters that petitioner's trial counsel's closing argument was constitutionally adequate and that, even if we conclude that it was not, petitioner has failed to prove that he was prejudiced by that closing. We agree with the state that petitioner's trial counsel was not constitutionally inadequate.

Even if we were to conclude that counsel's closing argument at the guilt-phase trial demonstrated a lack of professional skill and judgment, petitioner has failed to demonstrate that he was prejudiced by that closing. He merely speculates that prejudice was likely. As noted, we will not presume prejudice in the absence of proof offered by the party bearing that burden—petitioner. *Ryan*, 338 Or at 291. The post-conviction trial court did not err in denying petitioner relief on the ground that trial counsel's closing argument was constitutionally inadequate.

### 8. *Second penalty-phase counsel's investigation of mitigation evidence*

Petitioner contends that his attorney's performance during the second penalty-phase proceeding was constitutionally inadequate because that counsel failed to investigate mitigation evidence that petitioner contends proved he would not be dangerous in prison. According to petitioner, counsel at the second penalty-phase proceeding failed to uncover "widely available" evidence indicating that homicide rates in prisons are lower than in the general population and that death-row inmates tend to exhibit "far better institutional adjustment than average inmates." According to petitioner, this evidence was "essential to counteract probable juror misconceptions about the rate of violence in prison and by murder convicts." The state counters that petitioner's counsel during the second penalty-phase proceeding did produce mitigation evidence that petitioner would be unlikely to be dangerous in prison and, thus, provided petitioner with constitutionally adequate representation.

■ In the second penalty phase, petitioner's counsel called a number of experts to testify about the likelihood of petitioner's future dangerousness in prison. All agreed that, although it was difficult to predict the future dangerousness of any offender, petitioner was unlikely to pose a threat in prison. As the post-conviction trial court found,

> "[i]n the second penalty phase, counsel presented testimony of Drs. Larsen and Colby that petitioner had generally been non-violent in his many years of incarceration and that they believed he would continue that pattern if incarcerated in the future. Testimony of individuals who had contact with petitioner while he was incarcerated bolstered the doctors' testimony."

We do not understand how evidence regarding general rates of crime in prison and on death row would have bolstered in any significant manner the testimony of those experts who testified specifically about *petitioner's* relative dangerousness in prison. Thus, even assuming that the evidence that petitioner cites supports his position, it was not a failure of constitutional magnitude for counsel to have failed to adduce such evidence in the second penalty-phase proceeding. *Pratt v. Armenakis*, 199 Or App 448, 457, 112 P3d 371 (2005) (failure to adduce additional evidence urged by petitioner was not inadequate assistance because that evidence "would merely have supplemented the existing expert testimony with additional expert testimony as to the same conclusion"); *see also Krummacher*, 290 Or at 874 (counsel need not "expend time and energy uselessly or for negligible potential benefit under the circumstances of the case"). The post-conviction trial court did not err in denying petitioner relief on that ground.

9. *Trial counsel's failure to raise voluntary intoxication / diminished capacity defenses and failure to investigate evidence of petitioner's organic brain deficiency and fetal alcohol syndrome*

Petitioner also contends that his counsel during the guilt-phase trial was constitutionally inadequate for failing to properly develop and raise a voluntary intoxication defense and for failing to "properly investigate and secure evidence of [petitioner's] organic brain deficiency and fetal alcohol syndrome." According to petitioner, because Varzali

testified that petitioner had taken heroin shortly before going to the victim's apartment, defense counsel should have further developed a voluntary intoxication defense beyond merely requesting a jury instruction regarding voluntary intoxication. Petitioner contends that trial counsel should have obtained expert witnesses to testify regarding the physical and psychological effects of heroin use. Petitoner argues that such testimony would have supported his argument that the victim's death was unintentional. Similarly, he argues, because there was evidence adduced at the second penalty-phase proceeding that he may have suffered from an organic brain disorder, his guilt-phase trial counsel was inadequate for failing to discover that possibility and for failing to put on a guilty except for insanity defense under ORS 161.295.

The state counters that there was no evidence that petitioner was affected by heroin at the time of the murder, nor any evidence that his heroin use impaired his ability to form the requisite intent to commit aggravated murder. The state notes that Varzali could not testify to petitioner's mental state at the time that he went to the victim's apartment, nor could she state whether petitioner had taken a significant quantity of the drug. The state also points out that there was "other evidence of petitioner's conduct" that indicated that "petitioner was in full possession of his mental faculties" on the night of the murder and that petitioner was "fully capable of comprehending the consequences of his conduct." The state relies on the following findings of the post-conviction trial court:

"The evidence available to petitioner's defense team concerning the murder of [the victim] would not have supported a diminished capacity defense. Contrarily, the evidence demonstrated that petitioner carefully executed a plan to commit the robbery and murder of [the victim]. Specifically, petitioner and his co-defendant planned and executed the robbery of [the victim] after finding his personal ad in a magazine called 'Swing and Sway.' * * * In order to carry out their plan, petitioner called [the victim] to arrange a time to meet at his apartment[,] * * * then drove from Northwest Portland to Tualatin. Once they reached Tualatin, petitioner called [the victim] a second time so that [the victim] could meet them and direct them to his apartment. The careful execution of [that] plan * * * does not

support a defense premised on the assertion [that] petitioner was too intoxicated to form the intent to commit the crime."

Thus, according to the state, the evidence was such that any additional expert testimony as to the effect of heroin intoxication would have been unnecessary and petitioner failed to prove that his trial counsel's decision to refrain from further pursuing a voluntary intoxication defense was unreasonable.

The state further points out that petitioner has failed to prove that the psychiatrist who examined him for the second penalty-phase proceeding would have reached the same conclusion at the guilt-phase trial. The state also notes that testimony from mental health professionals at the first penalty-phase trial supported the conclusion that petitioner *did not* suffer from the sort of brain damage that would impair his ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. Therefore, according to the state, petitioner has failed to prove that a guilty except for insanity defense would have been available. Further, the state points out that the deliberate and premeditated nature of the crime was inconsistent with a guilty except for insanity defense. For those reasons, the state argues, a reasonable attorney would not have pursued a guilty except for insanity defense and, even if it was unreasonable for counsel not to pursue that defense, petitioner has failed to prove that he was prejudiced by that failure.

As the state points out, there was no evidence in the record of whether or to what degree petitioner was intoxicated at the time of the murder. *Cf. Short v. Hill*, 195 Or App 723, 730-31, 99 P3d 311 (2004), *rev den*, 338 Or 374 (2005) (in order to establish availability of a diminished capacity defense on the basis of methamphetamine withdrawal, the petitioner would have had to establish: (1) severity of withdrawal necessary to impair capacity and (2) how severe the petitioner's withdrawal was at time of crime). Furthermore, expert psychiatric testimony provided at the second penalty-phase proceeding indicated that "taken by itself * * * [heroin use] doesn't do much to impair your thinking." Petitioner adduced no contrary evidence at the post-conviction trial. In light of the evidence of petitioner's planning and deliberation

in executing the crime, it strikes us that expert testimony that would likely establish only that heroin use "doesn't do much to impair [one's] thinking" would have offered "negligible potential benefits" to petitioner's voluntary intoxication defense. Furthermore, the deliberation in planning and the successful execution of the crime contradict the idea that petitioner was so intoxicated that he was unable to form the requisite mental state for any of the elements of the crime. We therefore conclude that petitioner has failed to prove that trial counsel acted unreasonably in declining to further pursue a voluntary intoxication defense. *Krummacher*, 290 Or at 874.

█ Likewise, petitioner has failed to prove that he would have been able to establish the existence of an organic brain disorder at the time of the guilt-phase trial. In petitioner's first penalty-phase proceeding, a psychologist testified that, while there was some speculation that petitioner may have "organic brain syndrome due to numerous head injuries," petitioner did "not appear to have a thought disorder." Petitioner cites no evidence that, at the time of his guilt-phase trial, any mental health professional would have been willing to diagnose petitioner with the sort of mental disease or defect that would support a guilty except for insanity defense. *See Short*, 195 Or App at 729 (in order to prevail on claim that failure to investigate was inadequate assistance, "petitioner must adduce evidence at the post-conviction hearing that would have been discovered and introduced at the criminal trial had counsel undertaken the proposed investigation"). We thus conclude that it was not unreasonable for trial counsel to decline to pursue such a defense. The post-conviction trial court did not err in denying petitioner relief for his guilt-phase trial counsel's failure to pursue either a voluntary intoxication or guilty-except-for-insanity defense.

 10. *Second penalty-phase counsel's failure to object to verdict form*

█ Petitioner contends that his counsel's performance in the second penalty-phase was inadequate because counsel failed to object to the verdict form on the ground that it improperly implied that any verdict returned by the jury must be unanimous. As the state points out, petitioner failed

to submit the verdict form at issue to the post-conviction trial court and, therefore, this court "cannot determine whether the form impermissibly suggested to the jury that the verdict had to be unanimous." Petitioner replies that the second penalty-phase court's instruction to the jury regarding the signature page of the verdict form provides a sufficient basis to review the verdict form. We do not agree.

It is axiomatic that documentary evidence that is not included in the record cannot be reviewed on appeal. *E.g.*, *Cathcart v. Marshfield*, 89 Or 401, 403, 174 P 138 (1918); *Fisher v. Kelly*, 26 Or 249, 250-51, 38 P 67 (1894). That rule is no different in post-conviction proceedings. ORS 138.580 ("Affidavits, records, or other documentary evidence supporting the allegations of the petition shall be attached to the petition."). Furthermore, we do not agree with petitioner's assertion that we can adequately review whether the verdict form properly stated the law, based on the second penalty-phase trial court's instruction regarding the signature page of the verdict form. As the post-conviction court concluded, based on this record, we "cannot determine whether the form impermissibly suggested to the jury that the verdict had to be unanimous." The post-conviction trial court did not err in declining to review that issue or in denying petitioner relief on that ground.

11. *Trial and appellate counsels' failure to move to dismiss indictment*

■ Petitioner argues that both his trial and appellate counsel were constitutionally inadequate for their failure to move to have the indictments against him dismissed as void under ORS 132.020(4). According to petitioner, he was charged and tried on two separate indictments that were issued by two different grand juries, yet were based on the events of a single criminal episode. The state counters that petitioner failed to raise that defect before the post-conviction trial court and that he is now precluded from raising the issue on appeal. Petitioner concedes that he did not raise the issue below, but he contends that we may address it as an error apparent on the face of the record. Petitioner is mistaken.

Post-conviction proceedings are commenced by the filing of a petition that must "set forth specifically the grounds upon which relief is claimed." ORS 138.580. All grounds for relief must be stated in the original or an amended petition, and "any grounds not so asserted are deemed waived." ORS 138.550(3). The post-conviction trial court must determine whether "the petition states a ground for relief." ORS 138.620(2). As we have previously stated, the allegations in a post-conviction petition limit the issues before the court, and any claim that a petitioner fails to include in the original or amended petition is waived. *Bowen*, 166 Or App at 92-93. Because he failed to include that claim in his petition for relief, he has waived it in this proceeding.

## III. CONCLUSION

For the reasons discussed, we hold that the post-conviction trial court did not err in denying petitioner the relief that he seeks, and we affirm the post-conviction trial court's dismissal of his petition.

Affirmed.