LAGESEN, P.J.
*280 Petitioner, a former elementary school teacher, was convicted of one count of first-degree rape, two counts of first-degree sexual abuse, and one count of first-degree sodomy for conduct involving one of her students, C. See State v. Stephens , 255 Or. App. 37, 39, 296 P.3d 598, rev. den. , 353 Or. 868, 306 P.3d 640 (2013) (setting forth facts underlying defendant's convictions). She then petitioned for post-conviction relief, contending that her trial counsel rendered inadequate and ineffective assistance of counsel, in violation of petitioner's rights under Article I, section 11, of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. The post-conviction court denied relief. On review for legal error, Green v. Franke , 357 Or. 301, 312, 350 P.3d 188 (2015), we affirm.
I. BACKGROUND
The record evidences several factual disputes that the post-conviction court necessarily resolved in favor of defendant, the superintendent of the Coffee Creek Correctional facility, when it denied relief on petitioner's claims. In conducting our review, we are not free to revisit the post-conviction court's resolution of those factual disputes. Instead, we are bound by the post-conviction court's findings of historical fact if those findings are supported by evidence in the record. Id ."If the post-conviction court failed to make findings of fact on all the issues-and there is evidence from which such facts could be decided more than one way-we will presume that the facts were decided consistently with the post-conviction court's conclusions of law." Id . We state the facts in accordance with that standard, at times noting the factual disputes that were significant below.
A. Underlying Facts
Petitioner ran a small alternative elementary school known as Willow Cottage. C attended the school from 2001 to 2003, for fourth, fifth, and part of sixth grade. C's younger brother A also attended the school. During the time that the children attended the school, C's family became friends with petitioner's family, and the two families vacationed together.
*281 Petitioner's stepfather owned a cabin at the beach and the two families would sometimes go to the beach together. C and his brothers would stay with petitioner and her husband at the cabin, and C's parents would stay in a separate hotel.
C's parents withdrew both children from the school in December 2003. They did so because petitioner was demonstrating favoritism toward C and paying an excessive amount of attention to him. Before they removed C from the school, a parent meeting was held at which other parents requested that petitioner's "favoritism and the excessive attention being paid to [C] be curtailed and that he be treated in a way similar to the rest of the children." At that meeting, one *665 parent asked whether petitioner was having "inappropriate physical contact" with C. Petitioner largely remained silent at the meeting, but denied having inappropriate physical contact with C. However, later, at a school Christmas party, C's father observed that petitioner "was continuing to pay excessive amounts of attention to [C] relative to the other students." C's father observed petitioner "[h]overing over him, being close to him, putting her arm around his shoulder. Just being right next to him a lot more than the other children." It was after that Christmas party that C's parents decided to take him out of the school.
Several weeks or months after C left the school, his mother found a cell phone and charger in his bedroom, along with a love poem written by petitioner and signed with a heart and the notation "3[2]" and photographs of petitioner. She showed the items to C's father, who put them all in a manila envelope, which he then sealed and stored in a safety-deposit box. Neither C's mother nor his father had given him the cell phone, given him permission to have a cell phone, or given anyone else permission to give C a cell phone.
About five and-a-half years later, when he was 17, C disclosed to his parents that petitioner had subjected him to sexual contact on an ongoing basis while he attended the school. C did so after he told one of his peers about the abuse, and the friend encouraged him to tell his parents. C waited about a month, but ultimately decided to tell his parents out of a desire to "save some kids from going through what I did."
*282 C's parents immediately contacted the police, and gave them the cell phone and other items that they had retrieved from C's room and put in the safety deposit box. When interviewed by police, C told them that, when he was in fifth and sixth grades, petitioner had subjected him to "[a]nything from mutual inappropriate touching to oral sex and sexual intercourse." C explained that the sexual contact started when the families were on vacation in central Oregon together and petitioner started kissing him on the mouth while he was with her at the house she was staying in. C explained that the sexual contact continued until C was pulled from the school. Thereafter, according to C, he and petitioner continued to communicate by phone. Petitioner also drove to C's house a few times, and the two would "talk and what not" in the driveway before C would go to school. Petitioner gave C a cell phone, which he used to call petitioner for several weeks, until C's mother found the phone and took it away. C told officers that petitioner had a birthmark on the lower part of her body that was in the shape of a heart or a butterfly. C also told officers that petitioner had given him the love poem, and that the "3[2]" notation was a special code for the nine-word phrase "I love you; I know; I love you too."[1]
Following C's disclosures, the police interviewed petitioner. During that interview, which was recorded, petitioner said that she recalled C, and told detectives that the families had traveled together, including to the beach and Sunriver. When told what C had reported, petitioner denied having sexual contact with C. When asked whether she had bought C a cell phone, petitioner denied doing so. However, she told the interviewing detective that she had loaned the phone to C:
"I got my husband a cell phone, and [C] wanted to keep in touch with me after he had left the Cottage, and I let him borrow it for a day, and he took off with it.
"* * * * *
*283 "And I called and called to get that cell phone back."
The detective also asked if C had ever seen petitioner in a bathing suit or nude. Petitioner said, "No." The detective then noted that petitioner had said that she had been at the beach with C, but petitioner still denied that C had ever seen her in a bathing suit or nude. Petitioner told the detective that she would "undress in the bathroom" and was "very modest."
*666 The detective also asked petitioner about the photographs of petitioner and the love poem that had been found in C's bedroom. Petitioner admitted to writing the poem, but said that C must have just taken those things from the classroom, where they would have been available to C. Petitioner said that the "32" looked like "an exponential notation."
Officers arrested petitioner that day. Petitioner's lower body was photographed, which revealed a birthmark on her leg.
B. Trial
A grand jury indicted petitioner on one count of first-degree rape, two counts of first-degree sexual abuse, and one count of first-degree sodomy. Petitioner retained counsel, Cross, to represent her.
The defense theory of the case was that "[t]his is really a Walter Mitty" kind of a case, and that C's disclosures were the product of fantasy. To explain C's possession of the cell phone, trial counsel, consistent with what petitioner had told him at the time,[2] introduced evidence that, although the phone was petitioner's husband's phone, it was "common practice" at the school to use petitioner's husband's phone as a loaner phone. Petitioner's husband testified that he was familiar with the cell phone that had been found in C's possession and that the phone was his. He explained that he did not carry his cell phone much at the time, and that the phone was "available for other people to use," including both students and teachers. Petitioner's husband testified that, *284 at one point, Mahler, a teacher, had borrowed the phone "for a week during spring break." Petitioner's husband further testified that, at some point, he found out that the phone was gone, that C had the phone, and that efforts to get it back had not been successful. Mahler, a teacher, also testified that petitioner loaned her a cell phone to use over spring break.
As a result of an oversight, neither counsel nor his investigator had viewed the phone before the start of trial. As a result, although they had been aware that the phone in C's possession was relatively new when taken, they were not aware until the start of trial that the phone was accompanied by a charger that was still secured by what appeared to be the original twist-tie with which it had been packaged.
At trial, C testified about petitioner's birthmark, describing it as red and about "the size of a golf ball," an inaccurate description of the birthmark, which was smaller than a golf ball and not red. To address the fact that C was aware of the birthmark, trial counsel argued that C's description of the birthmark did not, in reality, bear close resemblance to the actual birthmark, making it subject to question. Although petitioner's husband had told counsel that he recalled a time at the beach when petitioner had been wearing a bathing suit and C had remarked on the birthmark, trial counsel did not introduce that evidence, choosing instead to focus on the discrepancies between C's description of the birthmark and the actual birthmark.
The jury convicted petitioner on all counts.
C. Post-conviction Proceedings
After an unsuccessful direct appeal, Stephens , 255 Or. App. 37, 296 P.3d 598, petitioner initiated this post-conviction proceeding. Pertinent to the issues raised in this appeal, she alleged that trial counsel was inadequate and ineffective in the following respects: (1) for failing to view the cell phone before trial; (2) for failing to introduce "readily available evidence" about the cell phone to explain why the loaner phone was as new as it was; (3) for failing to introduce evidence that the photographs of petitioner found in C's possession were *285 the product of a class project; and (4) for failing to introduce testimony from petitioner's husband that C had seen petitioner's birthmark while the families were at the beach and commented on it.
In support of the claim that trial counsel was inadequate for not introducing "readily available evidence" about the cell phone, petitioner and her husband testified that she had *667 been on her way back to the school after picking up a tool at the home of a former colleague of her husband's in West Linn, where C lived, and had stopped to talk to C when she saw him at the bus stop. Petitioner further averred that her husband's phone, which had been purchased 10 days earlier, was in the car with her because she was going to exchange it for a different model, but that C had grabbed it and run off with it. Petitioner and her husband were impeached with evidence that the friend whose home petitioner claimed to have visited in West Linn had not, in fact, lived in West Linn for a number of years at that point in time. Trial counsel also testified that that version of events had not been relayed to him at the time of trial, and that, at the time, he did not have "any reason to doubt that explanation as to how [C] got the phone. Because it, again, you know it, it made sense."
The post-conviction court denied relief. Addressing the claim about trial counsel's handling of the phone, the court explained:
"According to petitioner's deposition, she would have testified that she bought the phone on Jan. 20 and that Child took the phone and charger on Jan. 30. If that were the case, the charger should look new. A new charger is consistent with what petitioner is now saying about how the Child got the phone, but not consistent with what she told the trial attorney. The explanation he had to work with was that this was a loaner phone. A new charger isn't great for that defense, but that is what he had.
"Attorney's failure to look at the physical evidence before trial does not meet the standard for adequate representation, but there was no prejudice."
Addressing the claim about trial counsel's handling of the birthmark, the court concluded:
*286 "The trial attorney chose to defend the birthmark testimony by showing how inaccurate the Child was-how its shape, color and location do not match with the Child's testimony. There was testimony about how the mark in the photo could have been seen at the beach or the program [3 ] by the Child. The attorney could have emphasized these innocent occasions in which the Child could have seen the mark in the photos, but he chose a different strategy. That strategy was not unreasonable."
Finally, the court denied relief on the claim about trial counsel's handling of the photographs, explaining:
"The photo of petitioner that was found by the Child's parents was a peripheral issue. There was testimony about a photo project and an explanation of how photos were left for children and parents to take. The DA never argued about the significance of the photo. Additional testimony would not have a tendency to have affected the verdict."[4]
On appeal, petitioner assigns error to the post-conviction court's denial of relief on each of those claims, contending that trial counsel's handling of the cell phone evidence, the birthmark evidence, and the photographs did not meet constitutional standards, that petitioner was prejudiced as a result, and that the post-conviction court erred in concluding otherwise. Petitioner also argues that trial counsel's alleged deficiencies, even if not independently prejudicial, cumulatively warrant a grant of post-conviction relief. The superintendent responds that the post-conviction court did not err in any respect.
II. ANALYSIS
To establish that her trial counsel rendered inadequate assistance for purposes of Article I, section 11, petitioner was required to prove two elements: (1) a performance element: that trial counsel "failed to exercise reasonable *287 professional skill and judgment"; and (2) a prejudice element: that *668 "petitioner suffered prejudice as a result of counsel's inadequacy." Johnson v. Premo , 361 Or. 688, 699, 399 P.3d 431 (2017). A functionally equivalent two-element standard governs petitioner's claim of ineffective assistance of counsel under the Sixth Amendment. Id . To prevail on that claim, petitioner was required to demonstrate that "trial counsel's performance 'fell below an objective standard of reasonableness,' " and also that "there was a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " Id . at 700, 399 P.3d 431 (quoting Strickland v. Washington , 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ). We examine the challenged rulings of the post-conviction court in light of those standards. As neither party suggests that the state and federal constitutions require separate analyses, with respect to those particular claims, our analysis below applies to petitioner's claims under both constitutions.
A. Claim that Trial Counsel was Inadequate and Ineffective for Not Viewing Physical Evidence Before Trial
Petitioner first contends that the post-conviction court erred when it concluded that petitioner was not prejudiced by trial counsel's deficient failure to examine the physical evidence related to the cell phone before trial. Petitioner argues that, had trial counsel examined the evidence, he would have recognized how new the phone was. Then, counsel could have dealt with that issue by creating a timeline for the jury that would have demonstrated that the phone that C had in his possession was purchased in January 2004, and would have clarified for the jury that the loaner phone that Mahler had taken on spring break was not the same phone that was found in C's possession. This, petitioner asserts, would have made it more likely that the jury would have accepted petitioner's "loaner phone" defense.
Whether petitioner was prejudiced by trial counsel's failure to examine the cell phone before trial turns on whether "there was 'more than a mere possibility' " that counsel, had he examined the cell phone before trial, could have used that information at trial in such a way to give rise to "more than a mere possibility" that the jury could *288 have rejected the charges against defendant. Richardson v. Belleque , 362 Or. 236, 266-68, 406 P.3d 1074 (2017) (quoting Green , 357 Or. at 322, 350 P.3d 188 ) (sequentially analyzing the possibility that trial counsel could have used information that adequate investigation would have revealed, followed by possibility that the information, if used by counsel, could have affected the jury's verdict).
Here, the evidence introduced by petitioner below does not permit the conclusion that, had trial counsel inspected the phone before trial, there was "more than a mere possibility" that trial counsel could have used the information in a way that would give rise to "more than a mere possibility" that the jury would have reached a different verdict. Put simply, petitioner has not demonstrated that trial counsel had available any information or other evidence that he could have developed at trial that would have assisted the defense in any type of beneficial way. Developing a "loaner phone" timeline, as petitioner advocates that trial counsel could have done if he had inspected the phone, would not have tended to have affected the jury's decision. That approach would have focused the jury's attention on the fact that C could not have come into possession of the phone until January 2004, after he had been withdrawn from the school. Absent some benign explanation as to why petitioner had been in touch with C after he had withdrawn from the school and had allowed C to borrow a cell phone without his parents' knowledge, even though C was no longer at the school, focusing the jury on the fact that the phone had been acquired in January 2004 would not have advanced petitioner's case. However, apart from petitioner's largely discredited account about a chance encounter with C in which he ran off with the phone, the record in this case contains no evidence that would permit a finding that trial counsel had any such evidence available to him.
Under those circumstances, the post-conviction court correctly concluded that petitioner had not demonstrated that she was prejudiced by trial counsel's failure to inspect *669 the cell phone found in C's possession before the start of trial. *289 B. Claim that Trial Counsel was Inadequate and Ineffective for Not Presenting Evidence to Explain Why the Phone in C's Possession was New
Petitioner next asserts that the post-conviction court erred when it denied relief on her claim that trial counsel was inadequate and ineffective for not introducing affirmative evidence to explain why the phone was new. Petitioner argues that counsel exercising reasonable professional skill and judgment would have recognized the need to explain to the jury why the phone in evidence was so new, and should have recognized there was readily available evidence that trial counsel could have used to clarify that the phone in evidence was not the same phone that Mahler had taken on spring break. According to petitioner, trial counsel could have introduced evidence of a loaner phone timeline, which would have clarified for the jury that the phone in C's possession was one in a series of loaner phones.[5] Petitioner argues that trial counsel, if counsel had exercised reasonable professional skill and judgment, would have recognized that taking this approach would have minimized the harm to petitioner resulting from the fact that the phone was new, and that trial counsel's failure to take the identified approach tended to affect the jury's verdict.
On this record, the post-conviction court did not err in rejecting petitioner's claim. In evaluating trial counsel's decisions, we do not view them with the benefit of hindsight but, instead, assess their reasonableness in light of the circumstances that counsel confronted. Cartrette v. Nooth , 284 Or. App. 834, 841, 395 P.3d 627 (2017). Here, the version of events that was supplied to trial counsel at the time was *290 that C had taken the phone when he left the school. Under those circumstances, it was not unreasonable for trial counsel to rely on the information that he had been supplied and to develop that information at trial in the way that he did.
Additionally, for the same reasons discussed above, petitioner was not prejudiced by trial counsel's failure to develop the phone's timeline. As noted, the timeline inevitably would have called the jury's attention to the fact that petitioner had continued her contact with C after he had been pulled from the school, and petitioner has introduced no evidence (apart from her discredited story) tending to show that trial counsel had evidence available to him that would allow him to explain to the jury why petitioner had met with C-a sixth grader-in January 2004 without telling his parents and had let him borrow a new cell phone even though C was no longer enrolled in the school.
C. Claim that Trial Counsel was Inadequate and Ineffective in Handling the Photo Evidence
Petitioner's third assignment of error asserts that the post-conviction court erred in denying relief on her claim that trial counsel was inadequate and ineffective for not introducing evidence that the photographs of petitioner found in C's possession were produced as part of a class project. Having reviewed the record, we agree with the post-conviction court's assessment that the omission of that evidence could not have tended to affect the outcome of the proceeding. As the post-conviction court correctly observed, the photographs were a peripheral matter, and the additional evidence had little likelihood of affecting the jury's verdict, given the more inculpatory evidence of the cell phone and the love poem. Therefore, the court correctly concluded that petitioner was not prejudiced *670 by the omission of the additional evidence about the photography project.
D. Claim that Trial Counsel was Inadequate and Ineffective in Handling the Birthmark Evidence
In her fourth assignment of error, petitioner contends that the post-conviction court erred in denying relief on her claim that trial counsel was inadequate and ineffective for not introducing evidence, in the form of testimony *291 from petitioner's husband, that C had seen petitioner's birthmark at the beach and commented on it. Petitioner contends that such testimony was necessary to supply an innocent explanation as to why C knew about her birthmark.
Although such testimony may have had that effect, under the circumstances that counsel confronted at the time of trial, his decision not to introduce it was reasonable. Petitioner's pretrial statements were admitted into evidence, including petitioner's adamant insistence that C had never seen her naked or in a bathing suit, even at the beach. Thus, counsel faced a choice of introducing evidence that would contradict his client's previous statements and cast doubt on her credibility, or choosing, as he did, to attack C's credibility by highlighting the significant discrepancies between C's description of the birthmark and the actual photograph. Either choice would have been reasonable under the circumstances; counsel's decision to pursue the one that he did does not represent a suspension of reasonable professional skill and judgment. The post-conviction court therefore correctly denied relief on petitioner's claim that trial counsel was inadequate and ineffective in how he handled the birthmark evidence.
E. Cumulative Error
Petitioner's final assertion is that she is entitled to relief based on the cumulative effect of trial counsel's alleged errors. We reject that assertion without further written discussion.
Affirmed.

At trial, C testified that the sign was a representation of the syllables in the phrase "I love you, me, too," and was "a symbol that [petitioner] and I would exchange secretly." Upon being confronted with the fact that the phrase to which he testified did not have enough syllables, C was unable to recall the precise wording of the phrase that he and petitioner had used.

Petitioner and trial counsel supplied contradictory testimony as to what petitioner had told trial counsel about how C came to possess the cell phone. The post-conviction court necessarily discredited petitioner's version of events.

We understand the court's reference to "the program" to refer to the school generally.

In her brief, petitioner construes the post-conviction court's reference to "testimony about how the mark in the photo could have been seen at the beach or the program by the Child" to refer to testimony at petitioner's criminal trial, and asserts that that finding is not supported. We understand the court's reference to be the testimony to that effect in the post-conviction proceeding, and not a reference to the testimony presented in the criminal case.

Petitioner's argument on appeal on this claim has shifted in focus from the argument made below. Below, petitioner's primary theory on this claim was that trial counsel was inadequate for not introducing the evidence about her chance meeting with C, which led to C taking the cell phone. Petitioner claimed to have relayed that version of events to trial counsel, but trial counsel failed to present it to the jury. The post-conviction court discredited petitioner's testimony, finding that the version of events to which she testified in the post-conviction proceedings was not the same version that she told trial counsel. Petitioner appropriately has abandoned her contentions that trial counsel was inadequate for not introducing the discredited version of events. Pinnell v. Palmateer , 200 Or. App. 303, 324, 114 P.3d 515 (2005), rev. den. , 340 Or. 483, 135 P.3d 318 (2006) (because criminal defendant has no right to present perjured testimony, post-conviction petitioner was not prejudiced by trial counsel's failure to present perjured testimony).